OPINION of the Court, by
judge Wallace. — -
This is a suit for land, upon adversary titles, in which Grubbs, the complainant in the court below, obtained a decree for a part of the land ; from which both parties have appéaled to this court.
We shall first consider the complainant’s claim, as he must shew a good one in himself before he can prevail *393 against the elder patent, of his adversary. He claims under an entry of 5000 acres, in the name of Hugh. Sfffelds, which ,was made on the 25th of February 1783, containing the following description of the land, viz. “ lying on the waters of Otter creek, to adjoin Bled-soe’s entry of 700 acres on the southwardly side, oaths east of Farrow, and on the north of an entry laidotf the Little Blue Lick,and as far east as will include the-quantity, or to adjoin the bald hills.”
To determine the validity of this entry, we are necessarily led: to inquire into the relative positions of the several objects called for, with the view to ascertain therefrom its. certainty and local situation. The first calí is for the “ waters of Otter creek this call is but general description, and only answers the purpose' of pointing out the quarter of the country in which the land lies. The part of the country then being directed to, the next inquiry presented is for Bledsoe’s entry of 700 acres, on the u southwardly side” of which the one in question calls to adjoin.
tín the 25th of February 1783, Joseph Bledsoe entered 700 acres of land, with this description,. “ joining John South’s entry of 1000 acres, on an east branch of Otter creek, on the south and ea^f, to run southward and eastward to include the quantity by excluding prior entries.”
To obtain the benefit of Bledsoe’s entry, wé must first ascertain the situation of South’s, on which it depends.
On the 2d of August 1782, John South entered 1000 acres of land, described thus — lying on the. left tuugl of Otter creek, adjoining the east and south line of William Cooper’s settlement, and to run east and north for the quantity.”
We are still led to á farther inquiry in order to get at the bottom entry, which stands here as the foundation of the whole fabric. William Cooper’s settlement is made the main pillar of John South’s 1000 acre entry j io that to find the land covered by South’s entry that called for Cooper’s settlement, is indispensable.-».
On the 29th of December 1799, William Cooper obtained á certificate for a settlement and pre-emption, and on the 9th ofFebrüary 1780, entered his settlement iff 40© acres pursuant to the description in the certifi *394 cate, “ lying on the left hand fork of Otter creek, aboté the Clover Bottom, including a spring.”
With this chain of entries thus made, Shields’s entry was made, depending on them as one chief pillar essential to its support. But it was not trusted on this call' only ; its next call is for the “ east of Farrow.”
On the 29th of December 1779, John Farrow obtained^ certificate for a Settlement and pre-emption, and on. the 9th of February 1780 entered his settlement in the’ locative calls of his certificate, viz. “ lying on the south fork of the left hand fork of Otter creek, near the head thereof, known by the name of Farrow’s land,” and on 2<Sd of June 1780, Robert Barton, assignee of Farrow, entered the pre emption of 1000 acres adjoining around the settlement.
We proceed now to the next call, in order to bring into view the several claims called for in the entry, before we examine the sufficiency of any of them to support an entry at the time it was made. The next call is for the “ north of an entry laid on the Little Blue Lick.”
On the 23d of December 1779, Robert Fleming, the'assignee of Bernard Tatum, obtained a certificate for a- settlement and pre-emption;; and on the 3d of February 1780-, entered 400 acres in virtue of his settlement right, “ on a branch of Muddy creek, to include a lick known by the name of the Little Blue Lick, on the path from Boonesborough to the Log Lick,” and on the 23 d’ of June 1780, the pre-emption of 1000; acres was entered adjoining around the settlement.
The locator having thus described his land as bounded on the north, the west and the south, he then informs us that he will extend as far east as will include the quantity, or to adjoin the bald hills.
Having the several claims and objects upon which the fate of the complainant’s claim depends presented to consideration, we shall proceed to consider them in their respective bearings, one towards another, and as forming an entire object of description at the time this-entry was made.
The entries which have been recited, shew that the-claims called for in Shields’s entry did not exist at the-time of making it ; and their relative positions with respect to course and distance from each other, as deline» *395 «ted on the connected plat, shew that they answered the calls of said entry.
But whether the locative calls in those entries, in regard to their own certainty, were sufficient to communicate the requisite precision to the entry under consideration, is a question which can only be decided from the evidence of the case and the law applying thereto.:
We shall therefore proceed to examine each of those claims, in the order in which they are presented in the complainant’s entry.
The first call of this entry is for the waters of “ Otter creek.” It has already been observed, that this call describes only the particular part of the country in which the land lies. As such it has fulfilled its object, Otter creek being at that time of general notoriety.
The next subject of inquiry is Cooper’s settlement. Cooper’s settlement was located on the left hand fork of Otter creek and the Clover Bottom, including a spring. The left hand fork of Otter creek and the Clover Bottom were both of sufficient notoriety. Now whether from this description the search and inquiry of a subsequent locator for Cooper’s settlement would have been justly led to the vicinity of the Clover Bottom, to look for a spring within a convenient and reasonable distance above the same, on said fork, may in the progress of this investigation be an important inquiry.
In pursuing the meaning of the locator to a certain definite point, by a fair and liberal construction of his entry, when from any other construction the entry must be vague and uncertáin, it is conceived that subsequent locators were bound to adopt the former view of it; because they ought-to have construed it with a view to support, rather than to destroy-it: and for the same reason a court should so construe the entry. Here the maxim applies, ut res magis valeat quarn pereat.-
An entry, like all other instruments of writing, should be construed as leading to the most probable meaning of the party in effecting seme one main object, which seemed most evidently, m view. Now 'that object in this case was obviously to secure the man’s right to 40D acres of land, by describing it as near as might be mth regard to its local situation ; and this requisition of the law in the description of the land, ought to be considered from a view to the meaos within thepower of the *396 locator under the then situation of the country* A contrary construction would be to suppose that the law, in creating a right to which it gave a preference, imposed at the saíne time (to say the least of it) an unreasonable, if not an impracticable or impossible compliance. But the law must be presumed to have been made under a knowledge of things as they were, upon which its practical operation was intended to depend, and therefore applied to the state of things when those rights were asserted under its protection.
From this view of the subject, let us proceed to examine Cooper’s entry. An entry calling for a. spring on. a particular water course, must in the general be deemed too vague and uncertain to be supported. It is possible, however, that an entry containing that call only might be good ; but can it fairly be presumed that a person wishing with good faith to ascertain the place tyhere Cooper located his settlement* would be suspended ^between different springs, distantly situated, upon the water course above the Clover Bottom, if in fact such springs had been there ? To destroy the entry and deprive the man of his well earned right, which the law intended him, then construe it strictly, though literally true, and it may be applied at one or another of those springs, and therefore held void for uncertainty ; but to support the entry, that uncertainty would be avoided by this solitary understanding of its meaning, tfiat the spring intended was situated within a convenient and reasonable distance front the upper end of the Clover Bottom, and so could be "found by reasonable and proper diligence, and known to a common intent. Between these two constructions of the entry, who could 'seize upon the former in preference to the latter, except the after and less meritorious claimant, vvho was seeking to destroy rather than support it.
But in order to a more clear, as well as a more correct understanding of this entry, an attention to the following facts established in the cause will be necessary.
1st. That there is a spring about one mile and fifty poles from the Clover Bottom, on the same side of the ivater course, and which is about 55 poles from its source to the creek.
2d. That this spring was a very noted one, at the time and long before Cooper made his said entry ; that *397 it was much the most so of any orí the whole stream above the Clover Bottom, and that there was nope at that time which had deserved to be called a spring, or was known bv those conversant in that quarter, between the Clover Bottom and this spring.
3d. That this spring was frequently, if not generally called Cooper's spring, before he made his entry, at which place he had a survey made for him in 1776, under Henderson and Co. but which survey is not proven to have been generally known.
But opposed to these facts are the following; That the “ main left hand fork of Otter creek” forks itself about 120 poles above the Clover Bottom ; that there was a well known path which led up the left hand fork, passing through the Clover Bottom, and that crossed the other fork near its mouth, continuing np the longest prong. ,
It appears that the streams at their junction seemed nearly of a size ; that the longest one, for some distance above the junction, continued a southwardly, and the other for upwards of a mile and a .quarter almost a due east course ; that this prong was some times called P the left hand fork of the left hand fork,” and some times the “ east fork of t*je left hand fork,” and the other frequently called the “ south fork of the left hand fork,” and both called the “ left hand fork of Otter creek.” Upon each of these forks there are many springs represented in the connected pfot at this day : but there is but one laid down on the same side of the east fork between the Clover Bottom and the spring claimed by Cooper, arid that one is near the junction of the forks ánd in the creek.
V With regard to the reputation of these springs, and the degree Of attention they attracted at an early day, it may not be improper to state the substance of some of the evidence relative thereto.
Oswald Townsend deposeth, that in the year 1776, he. became acquainted with Cooper's spring represented in ^he-plat, and has known it ever since ; that the water course near it was then and for years after called and known by*the name of the left hand fork of Otter creek ; that in 1776 he was at the making of a survey under Henderson of 640 acres, fór William Cooper, which included the said spring that is now in Cooper’s settle» *398 ment above the Clover Bottom ; that in 1779-80, See, the said spring was generally known to the people about Boonesborough and that part of the country, and known to be the spring called for and claimed by William Cooper ; that he was acquainted with the waters of Otter creek in those years, and knew of no other spring on the left hand fork of said creek above the Clover Bottom.
Jesse Hodges deposeth, that he knew a spring called Cooper’s, in 1778, on the left hand fork of the left hand fork of Otter creek ; that he had heard it talked of by hunters, and thinks people frequently called there to drink in the dry season of the year, as it was a particular good spring ; and that he does not recollect of any other spring any where near it.
Lawrence Thompson deposeth, that in 1780 he came to Boonesborough, and in the winter or spring following he was shewn by Nathaniel Hart and others Cooper’s lands on Otter creek, also a noted spring which was notoriously known he believes by the hunters of Boonesborough and others that travelled that way as being the only spring in that quarter that was a lasting one at that early period, and that he knew of no other spring of notoriety above the Clover Bottom until the country became settled.
William Williams deposeth, that in 1782 he became acquainted with the spring called Cooper’s, and shortly afterwards was informed that the land around it belonged to Cooper ; that he got his information from John South and David Tanner ; that he understood the said spring was generally called Cooper’s, and believes it was a place of notoriety ; that he was acquainted on tiie waters of said creek, and knew of no other spring of such notoriety on said waters.
Stephen Hancock deposeth, that he became acquainted with the left hand fork of Otter creek in 1777-8, and continued so until he left Boonesborough in 1780 ; that he heard of Cooper’s spring, but did not know where it was, and knew nothing about his claim.
James Berry deposeth, that he always understood from information that Copper’s settlement lay on the left hand fork of what was called the east fork of Qtter creek, above the Clover Bottom, and that in 1782 or 17-83 he was with John South on the branch near Goov per’s land.
*399 The only negative testimony which seems material to be noticed, is that of William Bush. He deposeth that he ivas well acquainted with the left hand fork of Otter creek in 1775 and ever since, and was acquainted with no spring called and known by the name of Cooper’s spring, to his knowledge ; that there were a number of springs above the Clover Bottom on said creek, which were kept open by the buffaloes, and a number of famous ones that run flush through the winter and Spring seasons and afterwards went dry ; that he was acquainted with the Glover Bottom, and it went by the name of Cooper’s Clover Bottom in 1775 and ever since'; that the left hand fork forked just at the upper end of the Clover Bottom, and the one that the trace went up is the longest fork, but the left hand fork he thinks appears the largest in a flush time of water ; that Cooper’s Clover Bottom was frequently talked ofj and that he understood his claim lay there.
Considering then that the Clover Bottom was a place generally known by that name ; that it was called Cooi per’s, and that a spring in the neighborhood above it, distinguished for its excellence, and also called and known as Cooper’s by those mostly accustomed to range those woods, and could any have doubted as to the place where Cooper intended to lay his claim ?
Had Cooper been an actual settler on the land when He made his entry, or had an improvement there of undoubted notoriety, but bad made his entry calling to lie above the Clover Bottom, to include an improvement, not naming it his improvement, and it is believed the entry would be universally understood in regard to the improvement intended ; or if the improvement had possessed Jess notoriety, but was known to some as Cooper’s, and distinguished by the generality of hunters and others from all other improvements on the watercourse for its advantages in their convenience and accomodation, represented as being above the Clover Bottom, and in fact being within a convenient distance above, and could a doubt then be entertained ?
But could the entry inthe cases put be good, and bad in the present case? ⅜
In either case the entry would treat the object called for as descriptive only of the land intended and evincing the locator’s meaning; and á spring, under similar cis- *400 cumstances of notoriety or description, would answer that purpose as well as an improvement. •
It is objected that Cooper’s spring is not oik the maiii left hand fork.
The notoriety of the spring is entitled tp considerable weight tuwardsiobviating the objection But the stream is in fact the left hand fork, and was by some so called ; and Bledsoe’s entry distinguishes the fork intended, by calling it u ah east branch,” whilst Tanner’s entry called the other prong “ the south fork of the left hand fork and both these entries ought to be taken in explaining Shields’s entry, because it calis for them.
From the best view of the case we are able to take, it is the opinion of the court, that when Shields’s entry was made, Cooper’s settlement could have been ascertained with certainty by reasonable diligence, from its notoriety and the description furnished by the several entries proper to be noticed in this cause.
This entry should have been surveyed with lines to the cardinal points, including the spring designated in the connected plat by the largest C. in the centre of a square. ¶ 1 _
¶ The next entry to be considered, is John South’s^ of 1000 acres. This calls to adjoin the “ east and souths line of William Cooper’s settlement, and to run east. and north for the quantity.”
A difficulty is here presented as to the manner of surveying this entry. The call to adjoin Cooper’s settlement on the east and south, is sufficiently precise s but the next member of the entry conflicts with the first part, and produces a repugnance by calling to run eas| and north, instead of east and south for quantity.
This difficulty reduces itself to the alternative of the question, whether the locator intended to run his claim on, and entirely include Cooper’s settlement, or mistook and said north where he meant to say south t
That he did not intend to include Cooper’s settlement, seems clear to this court, for these reasons : 1st, Because Cooper’s claim was superior to his, both inequi* ty and priority; 2d, because bv the call for it, in South’s éntry, as affording certainty and precision, the locator thereby acknowledged its superiority ; and 3dly, because there could therefore be no possible in¿ dueement to throw away 400 acres of his entry upon # claim thus recognized by him as paramount to his.
*401 If then the idea cannot be entertained that the locator intended to lose 400 acres of his claim in Cooper’s settlement, it follows of course that he made a mistake of north, for south, and the preceding part of the entry serves as a sufficient clew to eVincé his meaning and the whole, entry should be taken together, front which to deduce the most probable, fair and rational meaning of the locator.; We, therefore, think that a subsequent locator, from a just construction of this entry, would have understood the mistake of the locator, and not have been innocently misled by it : and if he hoped to take advantage of the manifest slip or blun der of its maker, his own illiberality rnust atone for the consequent loss.
South’s entry ought to be surveyed in equal proportions on the east and south sides of Coopet’s settlement, when laid dowrias herein directed, and the eastern and southern boundaries continued south and east till they intersect and include the quantity.
And Bledsoe’s entry should then be surveyed to ad* join South’s in the same manner.
I Having ascertained the position of Bledsoe’s entry, Ion the south of which the complainant’s is tó adjoin, '.we proceed to examine Farrow’s claim ; his entry de-I pends on the call for Farrow’s land.
The evidence in the cause sufficiently proves that Farrow’s land was a place of general notoriety, and its situation was such that there could have been no doubt as to the body of the land intended.
But the difficulty in this call arises from a want of a definite and precise object of description; the evidence shews that there is at that place between one and two hundred acres of rich laud, which was formerly covered with cane, and is surrounded by poor oak land, and that this spot covered with cane was called Farrow’s land ; upon which he had a survey made under Henderson in 1776,,blit the precise boundaries of which are not shewn.
Now as Farrow?s settlement entry would cover the whole of this distinguished spot, and have to extend into the surrounding oak land for its complement, and as this place covered with cane was obviously different from the adjoining poor lands; it seems that this call for Farrow’s land might to be considered as certain and precise to a reasonable intent.
*402 But in addition to this, it is to be observed, that the . evidence in the cause has designated the exact bounda^ rieS as represented in the plat by the figures 6, which were called and considered as Farrow’s land. Hence thfe conclusion that this description of the land was suf•ficiently special and precise to' süstaiñ the entry ; we áre therefore of opinion that the settlement ought to be surveyed including the spot designated by the figures 6 in the centre of a square* with lines to the cardinal points.
But the complainant’s érttry calls for the east of Farrow, and it appears that Farrow had transfered the pre-emption right appeudanton his settlement to Robert Burton, who in June 1780, entered the same in his own name as assignee of Farrow, adjoining around the settlement.
The question here occurs, whether the complainant’s entry must be construed to adjoin the settlement or the pre-emption. Upon this question one of the court has and still entertains doubt, arising from the evidence in the cause, which proves that the claim and land were called and generally known as Farrow’s ; the intimate connection between settlement and pre-emptions appen-dant thefeon, and the probable belief that other locators could not justly have supposed that Shields intended to adjoin the settlement through the pte- emption appen-dant thereto, which had been so long of record.
r But the doctrine having been settled, that the call in an entry, to adjoin the land of one who was entitled toa settlement and pre-emption before the pre-emption was entered, must be taken to adjoin the settlement ; and in this case the entry calling for the land of one Who never had the pre emption entry, but which was in a different name, the court therefore cannot support an equity ofthe complainant, thus dubious, to the overthrow of the title at law.
It is, therefore, the opinion of the court that the entry ought to be construed to adjoin the settlement on the east side when laid down as herein directed.
The next call to be considered, is that which depends on the" “ north of an entry laid on the Little Blue Lick.”
It has already been shewn that in the year 1780, Fleming, as assignee of Tatum, located a settlement and *403 pre-emption on this lick, and it is proven that the said J¡ck was generally known by the particular and appropriate name of the Little Blue Lick, before and at the time Shields made his entry. But Shields not having given the name of the claimant of said entry, it is contended that a subsequent locator could not ascertain with reasonable diligence the entry, and of consequence its quantity and position on the Little Blue Lick.
It is well proven in the cause, that Fleming’s was the only claim which had been laid on that lick, and the presumption is very strong and satisfactory, from the evidence, that information could easily have been obtained whose entry lay there, by making the usu d and ■reasonable inquiries of those from whom such information was most probable to be acquired wh.n Shields made his entry. * ■'
But whether Shields ought to be governed i by the settlement only, or by the settlement and pre-emption taken together, has also given rise to some doubt. It seems, however, to the cotirt, to be but a liberal and just construction of the entry, to say that the locator would have been understood to adjoin both the settlement and pre-emption as one entire claim, both - having been long previously entered.
Fleming’s settlement and pre-emption were rightly surveyed with lines to the cardinal points, including th# .'lick in the centre of a square of 400 acres, and the preemption around the settlement iu equal proportions on every side.
Having ascertained the boundaries of Shields’s entry pn three, sides, we conje now to consider the last call, viz : “ to extend as far east as will include the quantity, or to adjoin the bald hills.’’
It is contended that the entry ought not to be .extended east of the bald hills ; bat there are many bald hills within the limits of the entry, and to restrict it to the west of them, the locator would not have obtained one third ofhis claim. Besides, it is impossible to conceive why the locator, should have used the, expression to “ adjoin the bald hills,” for the purpose of confining his entry on the west ; there was no other call in the entry upon which to obtain the quantity, and in fact bo other direction in which it could be obtained ; and the owner could as a matter of unquestionable right *404 stop wheh he reached the bald hills, if he .chose to do so, without such restriction in his entry.
It seems, therefore, to be the just inference, that the locator intended to go east to the bald hills, and then to run around, excluding them, for the quantity.
But from the number of bald hills and other parcels of land between them, within the hounds of 5000 acres, it would he almost impossible to give efficacy to this call, under any rule which might not have operated unjustly on other locators.
We áre therefore of opinion that the rule which has been pursued by this court in regard to a call in an entry to exclude prior entries, will here apply, and that the entry is good for the quantity ne^t its base,
When those boundaries of the claims which the complainant’s entry calls to adjoin are ascertained as herein directed, Shields’s entry ought then to adjoin Farrow’s settlement on the east, continuing north and south until it strikes the southern boundary of Bledsoe and the northern boundary of Fleming’s pre-emption, when they are extended west; thence east with said claims, and the same course continued for the quantity.
But'because the defendant holds under the superioi right, so far as his entries and surveys have been made conformable to law, it is therefore necessary to investí- . gate said claim.
He claims under a settlement and pre-emption grant* ed to James Bridges. The settlement entry was made on the 17th of January 1780, on Muddy creek, to include his improvement ; and the pre-emption was entered on the 31st of May 1781, “adjoining the settlement, half above the said settlement and the other half below the settlement, to run up and down the creek fot quantity,”
The general notoriety of Bridge’s improve ment is ■established, but the witnesses do not satisfactorily identify the precise spot where it was. Several swear that it was within a hundred yards of a particular place Shewn by them ; William Bush seems more precise in identifying the spot, and shews a place for the improvement within less than a hundred yards of that as above shewn.
It seems ,therefore tp the court, that the said place «heyyh by -Bush designated in the plat by the ftgur^; *405 S, ought to be taken as the place where the improvement was, and that the settlement should be surveyed with lines to the cardinal points, including the improvement in the centre of a square.
The pre emption should be surveyed adjoining the settlement, when thus surveyed, above and below, m 500 acre surveys ; and as the call to “ run up and down the creek for quantity,” controls the form of the preemption in relation to the settlement, according to the particular course of those parts of the creek. It seems that it should be so surveyed that the creek will pass through the middle of the upper and lower lines of each survey, when reduced as near a squire as maybe to adjoin the settlement and to avoid an interference with each other, which would happen from the situation of the creek in running through the west and north boundaries of the settlement, when laid down as herein directed.
Wherefore it is the opinion of the court that the defendant has the superior right to so much of the land in controversy as will fall within his respective rights of settlement and pre-emption as each has been surveyed, when they are laid down conformable to this opinion, and that the complainant has the better right to the residue lying within his survey, and which will be included within the same when laid down as it ought to have been made agreeable to the foregoing opinión, and whichfwill likewise be included by his deed of conveyance exhibited in the cause.
This sdit was commenced on the 13th of July 1805, "and the complainant, in support of a right under Shields’s claim, offered in evidence on the hearing of the cause a deed of conveyance bearing date the 21st of January 1807, to which the defendant objected, because it was -evidence of a right acquired posterior to the commencement of the action.
Whereupon the parties to the suit agreed and entered the same of record as a part of this cause, that the deed /should be used as evidence in the cause 5 but the defendant to have the benefit of the objection to the title thus made out in both the circuit and appellate courts; and if the appellate and circuit courts, or either of them, should be of opinion that the title made out by the coin-¡plaiaaat-did nof authorise the commencement of this *406 stilt, the court or courts are to pronounce such decrees as to costs as would be decreed according to the rules of chancery if no agreement were entered into : and moreover that the court should notwithstanding the objection proceed to adjudicate upon the merits of the land titles set up in the cause.
It seems from the statement of the parties that the objection was predicated on the idea that this suit could not be maintained until a regular conveyance was duly executed by the femes in whom the fee simple estate vested. But we conceive it unnecessary to decide this point, because on examination it does not appear that the complainant, was possessed of any interest whatever in Shields’s claim when he commenced this suit.
The deposition of Thomas Bodley has been taken its support of an equitable interest, hut which proves that the final agreement for the land was made between the 30th of May and the 20th of August 1805, as the bonds for the payment of the purchase money bear the latter date. But the deposition also states that the husbands of the jemes had agreed to sell the claim to the complainant upon his giving bonds with approved security, for the purchase money»’
This evidence shews that the sale depended on the execution of bonds for the purchase money ; but as those bonds were not executed until the 20th of August 1805, therefore the just inference is that the sale was not made before the commencement of the suit, which wás in^ July ; and we concur with the circuit court in the opinion that the evidence of á right acquired after the commencement of the suit, was incompetent to main® tain the action. The consequence is, that the complainant must pay the costs of the suit. But whether in this case, under the agreement of the parties, the costs in bringing the cause before this court shall also be embraced, presents another question.
If the cause were brought up before this court on the single question as to the dismission of the complainant’s bill, were it not for the agreement of the parties the af- '| firmance of the decree would of consequence be with costs; but the parties having agreed that the court should decide on the merits of the claims, now if the defendants only had appealed from that decision, and' this court should affirm it, we can perceive nothing m, I *407 the agreement which ought to be construed to subject the complainant to the costs of the appeal. If,this be ⅞ correct view of the subject, it seems to follow that had the circuit court erred on the merits against the complainant, and he had appealed and obtained a reversal in his favor, that in such case he ought to have his costs in the appeal.
It remains to consider another and the' last question in the cause, whether the complainant could as a matter of right discontinue the suit as to the 300 acres which .had never been surveyed? '
( Whether this 300 acres may yet be surveyed, does not appear from any thing in the cause ; and it might be prema ure and improper for the court to say any thing upon this point* The survey then of this 300 acres not having been made, and it not appearing to the court whether it can now be legally done, hence it is conceived that the court below vvould have Correctly dismissed the bill with regard to the 300 acres, as coming prematurely before it, if it had been presented for decision ; but this dismission ought then to have been without prejudice to sue when the complainant could make out a title derived from law. If such then should have been the decision of the court, it seems that the complainant might have discontinued his suit, as a suit prematurely commenced or improperly conceived, and consequently that the court erred in refusing that leave.
; The opinion of this court being in sonáe respects variant from the decree of the circuit court as it affects both parties, wherefore it is decreed and ordered that the said decree of the circuit court, so far a£ it differs from the foregoing opinion, be reversed and set aside : which iá ordered to be certified to the said court, who •are directed to,enter a decree conformable to this opi-nión, and to decree whatever farther shall be necessary in the cause. As each party had some cause of appeal, and the recovery of costs in this case would operate equally and reciprocally, it is therefore farther ordered that each do pay his own costs in the prosecution of the appeals. ,